LOUIS C. HARTDORN AND WILLIAM H. RADCLIFF, PLAINTIFFS IN ERROR, v. THE WEBB MANUFACTURING COMPANY, DEFENDANT IN ERROR.

Argued March Term, 1909—Decided February 26, 1910.

1.  Webb, the secretary, superintendent and manager of a manufacturing corporation, caused the arrest of the plaintiffs, two former employes of the company, for the larceny of certain articles, the property of the company, found in their possession. The plaintiffs claimed that Webb had given them these articles, but of this claim the corporation had no actual notice. The plaintiffs were tried and acquitted of the charge, and they then brought an action against the company for malicious prosecution. Webb had no express authority, nor had he any implied authority to give away the property of the company, and the gift, if made, was a personal matter between him and the plaintiffs, and so knowledge of the gift was a fact not imputable to the corporation. The other facts, knowledge of which by Webb was imputable to the company, in the absence of notice that plaintiffs claimed the articles by gift from Webb, were such as to create a probable cause for the company to believe that the plaintiffs were guilty of larceny.
2.  Where the facts are not in dispute, the question of probable cause, in actions for malicious prosecution, is one of law.

---

NOTE.—This opinion was rendered at the November Term, 1909, and should have been published with the opinions of that term, but was overlooked by the reporter.—REP.

On error to the Supreme Court.

For the plaintiffs in error, *Patrick J. Dolan* and *Michael J. Tansey.*

For the defendant in error, *Herbert W. Knight* and *John A. Bernhard.*

The opinion of the court was delivered by

REED, J. Two judgments on verdicts directed for defendants are brought up by separate writs of error. One is in the case of Louis C. Hartdorn *v.* The Webb Manufacturing Company, and the other judgment is in the case of William H. Radcliff against the same company. The writs of errors in both cases were argued together.

Both actions were for malicious prosecution. They were tried together, and upon the trial there were directions of verdicts for the defendants.

The question propounded is whether the plaintiffs, or either of them, were entitled to go to the jury.

The skeleton of facts is that both plaintiffs were arrested on the complaint of Hartwell W. Webb for stealing articles from the Webb Manufacturing Company. Both were indicted, tried and acquitted. For this arrest the actions were brought.

The complaint upon which the arrest of the two plaintiffs was made was signed and sworn to by Hartwell W. Webb. The complaint stated that Radcliff and Hartdorn did feloniously steal and carry away brass fixtures, parts of speed indicators, pinions, clamps, gears, and flexible shafts of the valuation of $500 from the premises of the Webb Manufacturing Company, at the corner of Columbia and Green streets, in the city of Newark; also at 60 and 62 Shipmant street; said Webb Manufacturing Company being the owners of said property in conjunction with one Edward H. Webb. This complaint was sworn to on August 21st, 1906.

It appears that both Radcliff and Hartdorn had been employed by a company known as the Webb Company. This company was changed to the Webb Manufacturing Company

on January 12th, 1906. Hartdorn had begun his service with the old company in November, 1904, and remained with the old and the new companies until March 28th, 1906. When Radcliff began his work with the old company is not stated with precision, but he left the service of the new company at the time of his arrest in August, 1906.

The business of the Webb Manufacturing Company was at first the manufacture of speed indicators, and afterward the manufacture of speed odometers, in connection with the indicators; and then to connect the one of these with the other, it manufactured a flexible shaft. Radcliff says that he was foreman and toolmaker in the Webb Manufacturing Company's service. In the latter part of 1905 Hartdorn began, and in January, 1906, effected an organization called the National Flexible Shaft Company, in which company he interested Radcliff, and financially, one Mr. Racine. The business of this company was, among other things, the manufacture of flexible shafts, and so was a competitor of the Webb Manufacturing Company. Both Radcliff and Hartdorn, while still working for the Webb Manufacturing Company, were experimenting and manufacturing, or trying to manufacture, flexible shafts; and Hartdorn, after leaving the Webb's, devoted himself to this work.

Mr. Hartwell W. Webb, who was the active person in the operation of the plant of the Webb Manufacturing Company, says that some time in June, 1906, he received information from a Mr. Tucker that he, Tucker, suspected that Hartdorn and Radcliff were making flexible shafts. Mr. Webb says that on August 16th he received a visit from Mr. Racine, already mentioned, who asked Webb whether he knew that Hartdorn and Radcliff were in business, and said that he, Racine, came to see Webb because he did not wish to involve himself in any action that might be brought against him with reference to the things he had found on the premises; that he, Racine, told Webb that he was treasurer of the National Flexible Shaft Company; that he had found gears and brass clamps and stuff there to account for which he had found nothing on the books; that Hartdorn and Radcliff had re-

quested him to give a bond as treasurer, and that he would not do so until he was sure where the stuff came from; that Racine told him, Webb, that he was first led to suspect something wrong when some person came up there and told Racine and Hartdorn that some one was coming up from the Webb Company, when Hartdorn immediately got down on the floor and began to scrape up some clamps that were used for binding the ends of the flexible shaft, of which there were eight or ten pounds there. That Racine further said that Hartdorn and Radcliff were talking about a gear; that Hartdorn had told Radcliff to get as many of these as he could before he left Webb's.

After this conversation with Racine, Mr. Webb consulted his brother, Mr. E. H. Webb. These two, with Mr. Racine, went to see Mr. Helm, the lawyer of the company, but, not finding him, they went to police headquarters and asked for an officer to go with them to the factory of the National Flexible Shaft Company. The officer at police headquarters advised them to first go to that place with Mr. Racine, who was an officer of the company. This they did. There, Mr. Webb says, he found a lot of articles which he recognized as formerly manufactured by and belonging to the Webb Manufacturing Company. Many of these were taken to the police station. This was on Sunday, and on Monday they found and consulted Mr. Helm, the lawyer, and after stating the facts to him he advised them that there was a ground for a charge of larceny, and probably of embezzlement. Helm advised a consultation with Judge Skinner, to whom Webb again detailed the facts, and Judge Skinner advised a charge of larceny. A search warrant was issued, under which the plant of the National Flexible Shaft Company was examined, a gear found, and afterward a complaint appears to have been made and a warrant issued for the arrest.

The plaintiffs admitted that many, indeed most of the articles found by Mr. Webb had been taken away from the factory of the Webb Manufacturing Company and had been the property of the Webb Manufacturing Company, but they insisted that every article had been given to one of them by

Mr. Hartwell W. Webb. Radcliff says that about a month or six weeks after the Webb Manufacturing Company was formed, Mr. Hartwell W. Webb told him to gather together all the materials that were around the place for the purpose of selling them to a dealer named Schueler; that Mr. Hartdorn asked for a few of the castings, and he was told that he could take them, and that he did so.

Hartdorn says that he was told that he could take some gears out of the same scrap. He also says that Mr. Webb had given him lots of things at different times, which things he threw away when he moved to Franklin street. Among other things, Webb had given him a bevel, which was produced at the trial.

As already observed, the trial court, at the close of the testimony, directed a verdict for the defendant in both cases. In reviewing this direction, it is to be observed that there was no express direction by the board of directors of the Webb Manufacturing Company that Mr. Webb should cause the arrest of these persons; nor was any general authority given to Mr. Webb to cause the arrest of any person suspected of larceny of the company's property. Nor did the official relations between the Webb Manufacturing Company and either of the Messrs. Webb imply a power in them to act for the corporation in causing such an arrest. Mr. Hartwell W. Webb was the secretary, and Mr. Edward H. Webb the treasurer of the company. Upon neither of such officers was there conferred *ex virtute officii* a power to bind the corporation by causing criminal process to issue against the plaintiffs.

But it is insisted that Mr. Hartwell W. Webb was more than secretary; that he was the active manager and superintendent of the manufacturing business carried on by the corporation, and so had supervision over the materials manufactured, and the materials and machinery used in its manufacturing business.

The responsibility of a corporation for an arrest caused by its agent in the performance of his duty to protect or recover the property of the corporation, need not be discussed. It

need not be discussed, for, assuming that if the Webb Manufacturing Company had been possessed of a knowledge of all the facts which might have been known to Mr. Webb, or, assuming that the knowledge of such facts as Webb possessed was imputable to the corporation, the corporation would be liable for Webb's acts—nevertheless, we think the direction of the verdicts was right.

The question involved is not whether Mr. Webb had probable cause to believe that the plaintiffs were guilty of larceny of the articles—the property of the corporation found in the plaintiffs' possession; but the question is whether the corporation had cause for such belief. If the facts actually or constructively known to the corporation were such as to lead it to think that there was a probable cause for the plaintiffs' arrest, that fact would afford a clear legal defence to the corporation in an action brought by the plaintiffs for malicious prosecution in causing their arrest; and if the facts actually or constructively known to the corporation existed indisputably, then whether such probable cause existed was a question of law.

Now the fact that the property alleged to have been stolen was the property of the corporation; the fact that it had been taken away by Hartdorn; the fact that it was found on the premises of the plaintiffs; the fact that Racine had communicated to Webb the circumstances already detailed—are undisputed existing facts. Assuming that knowledge of these facts were known to the corporation because they were known to Webb, the company would have had reasonable ground to believe that the articles had been stolen by the plaintiffs.

Now the fact upon which the plaintiffs rested their defence was that Mr. Webb had given to Hartdorn the articles alleged to have been stolen. Webb indeed, denied this; but, assuming it as a disputed fact, it is still undisputed that no actual knowledge of this claim by the plaintiffs ever came to the corporation, therefore, to put the corporation in the position of having acted with this knowledge, it must be assumed that the knowledge of the alleged act of Webb in giving to the

plaintiffs this property is imputable to the corporation because Webb was its agent. But it is perceived that while Mr. Webb may have had the power to act for the company in preserving, or even selling the property of the corporation, he had not a shred of authority to give away the property of the company. Such a transaction was a purely personal matter between himself and Hartdorn. Indeed, Hartdorn knew —according to his own statement—that Webb was so dealing with the property surreptitiously, for Hartdorn says that Webb remarked at the time that scrap was gathered out of which the property was taken: "Hurry up, because I don't want none of the stockholders to walk in and see it, because what they don't know won't hurt them." But disregarding this remark, it is clear that the alleged act of Mr. Webb in so dealing with the property of the corporation was entirely aside from his authority, as such authority appears in the testimony, and his act was one entirely personal to himself. Knowledge of the fact that Webb had given the property to Hartdorn was, therefore, not imputable to the corporation.

The principle which underlies this rule is illustrated in the case of *Graham* v. *Orange County Bank,* 59 *N. J. L.* 225, and in the line of cases collected in the note to be found in 6 *Am. & Eng. Anno. Cas.* 679.

So, if all knowledge of the other facts, namely, the fact that Webb had been told by Racine of the circumstances already set out, the fact that the articles had been in the possession of the Webb Company, the fact that they were in the possession of the plaintiffs, the fact that no sale of these articles had been made—were impliedly known to the company, yet in the absence of any imputed knowledge that the articles had been given to the plaintiffs by Mr. Webb, there was probable cause apparent to the corporation for thinking that the plaintiffs were guilty of larceny. Therefore, whatever may have been the right of action against Hartwell W. Webb, the action properly failed against the defendant.

The judgments upon the direction of the verdicts should be affirmed.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, GARRISON, SWAYZE, REED, TRENCHARD, PARKER, BERGEN, VOORHEES, MINTURN, BOGERT, VREDENBURGH, VROOM, GRAY, DILL, JJ. 15.

*For reversal*—None.